IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ROGER KNIGHT and HOWARD KING,<br><br>Appellants,<br><br>v.<br><br>CITY OF MOUNTLAKE TERRACE,<br><br>Respondent. | No. 88160-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — The city of Mountlake Terrace (the City) initiated a code enforcement action against homeowner Howard King and landlord Roger Knight after learning of dangerous and unsanitary conditions on residential property that was leased to tenants. The City's hearing examiner affirmed the code violations assessed by the City and the superior court denied a petition under the Land Use Petition Act[1] (LUPA). King and Knight appeal, challenging procedural rulings of the hearing examiner and asserting that the hearing officer's decision is void for lack of jurisdiction and due to a conflict of interest. We affirm.

FACTS

This case concerns residential property located in Mountlake Terrace owned by

---

[1] Ch. 36.70C RCW.

Howard King[2] and managed by Roger Knight. In the Spring of 2024, the City learned that the home, occupied by tenants, had "sewage from a clogged side sewer system being pumped into the side yard" of the property. The City received a plumber's report that sewage flowing from a "clean out" access to the sewer line was "all over the yard" and "flooding the underside of the house." The report further noted piping that "was not done correctly."

City employees investigated and confirmed the presence of sewage in the crawlspace and sewage being pumped to various locations on the lot. They observed multiple, visible modifications to the sewer line, drain, venting, and heating systems that were not permitted, not installed according to code, or both. Inspectors discovered electrical code violations, described as unsafe and "atrocious," including an uncovered electrical panel, exposed wiring, and "not supported" wires "spliced in the air." They described a "pronounced" and "nauseating" smell of sewer gas and mold in the main home, sewage residue in every tub and shower pan, and a "shocking" amount of mold and mildew on the walls. They also noted that a structure on the property, permitted as a greenhouse, had been converted to an Accessory Dwelling Unit (ADU) without proper permits, was not fit for occupancy, and was occupied by tenants.

The City issued a Notice of Violation (NOV) on May 17, 2024, outlining seven violations of the Mountlake Terrace Municipal Code (MTMC). Among other violations, the City determined that, primarily as a result of sewage issues, the main residence was uninhabitable. The City assessed violations related to lateral sewer lines based on lack of permits, improper installation, and inadequate maintenance. And the City assessed

---

[2] We refer to Petitioner King as "Howard" in accordance with his signature on relevant filings in this matter, although the record shows that he also uses "Paul" as his first name.

violations related to the ADU structure. The NOV set forth requirements to address each violation and set a September 1, 2024 deadline for correcting the violations.

On June 13, 2024, King and Knight appealed the NOV and requested a hearing before a hearing examiner. At the first hearing on September 25, 2024, the City attorney and Knight appeared in person, and King appeared remotely. King and Knight asked for "discovery," asserting they had no documents other than the "complaint." The City argued that formal discovery was unnecessary and unwarranted. But in line with its usual practice, the City had compiled all relevant documents in a "binder," brought a copy of the binder for the hearing examiner, and another copy for Knight and King to share.

Knight and King requested a continuance of "at least several weeks" to review the binder. The City opposed the request, arguing that the conditions on the property posed pressing health and safety issues. The City also pointed out that Knight and King were familiar with most of the material in the binder, since more than half was comprised of e-mail correspondence between them and City officials and it included other documents they already had, such as the NOV and their own public records requests.

After Knight confirmed that he had daily contact with King, would be able to share the binder with him, and they would "go over it together," the hearing examiner granted a one-week continuance. When asked if there was a reason King would be unable to appear in person the following week, he responded, "I have to be careful with that. I have a pain doctor down in Fred Hutch that I work with." The hearing examiner informed King that he would be required to appear in person at the next hearing, "absent a

declaration" from a "medical doctor" establishing good cause to allow him to appear by Zoom.[3]

After the hearing, Knight and King filed motions, including a motion seeking a 60-day continuance for medical reasons. They asserted that King had cancer and would begin a new round of chemotherapy treatment shortly, on October 1. They also reported that King's physician denied a request to increase his pain medication so he could "finish the paperwork" for the hearing and attend the proceedings, and King's ability to participate was essential because of his historical knowledge of the property. In a written order on the motion, the hearing examiner confirmed that he had reviewed documentation King provided about his medical condition—a September 26, 2024, letter signed by a physician. While denying a continuance, the hearing examiner granted other accommodations, allowing King to participate by Zoom, request breaks at any time, and request a recess if any hearing exceeded two hours.

Knight and King filed a motion to reconsider or clarify the ruling, reporting that King's physician believed that he should not be required to testify "with or without" accommodations. In support of this motion, they attached an October 1, 2024, letter, providing substantially the same information as the September 26 letter, but signed by a pain clinic staff member, not King's physician.

The City presented the testimony of three witnesses: a code compliance officer, an electrical inspector, and a building inspector over the course of two hearings on October 2 and October 7, 2024. When the evidentiary hearing convened on October 2, King, appearing by Zoom, reported that Knight was at superior court trying "to get a

---

[3] "Zoom" is an Internet-based videoconferencing platform.

4

stay." King renewed his motion to continue for medical reasons, claiming that medications were "affecting" him, he was not "in shape" to proceed, and his medical providers felt his testimony would not be "reliable." The hearing examiner denied the motion, explaining that the medical documentation he reviewed was not persuasive because, among other things, it was conclusory, not a sworn statement, and inconsistent with his observations. The hearing examiner also declined to stay the proceeding due to Knight's absence. Knight eventually appeared and confirmed he had shared the binder materials with King. At the conclusion of the first witness's direct testimony, the City moved to admit several documents from the binder as exhibits. The hearing examiner admitted the exhibits, overruling certain objections King raised.

Before cross examining the City's first witness, King asked to adjourn, citing his medical condition and stating that the hearing was psychologically "too much." Although the hearing examiner did not specifically deny the request, King then proceeded to make oral motions, one of which was granted, and both he and Knight cross examined the witness.

At the conclusion of the witness's testimony, the hearing examiner asked the parties to review their calendars and provide their availability for hearings the following week. King said he had "cancer appointments" on October 7 and 8, that he believed would start at 11:00 a.m. and last an "hour to two." Based on this representation, the hearing examiner scheduled the next hearing at 1:30 p.m. on Monday, October 7, and, "if necessary," on October 8 at the same time. And finally, based on offers of proof, the hearing examiner granted King's and Knight's request to issue subpoenas for two witnesses.

When the hearing convened five days later, on October 7, King continued to appear by Zoom and reported that Knight was "on his way." At the outset, the hearing examiner first addressed motions submitted by Knight and King by e-mail, seeking a continuance in order to retain counsel, obtain discovery, and address King's medical issues. The hearing examiner denied the motion as to the first two reasons because the matter had been pending for some months and Knight and King had the binder provided by the City. As to the motion related to King's medical issues, King reiterated his position that going forward was "not a good idea" because of medication he was taking and because he felt he was functioning at "35% capacity." And King asserted that the issues at the property were no longer urgent because the tenants had vacated. The court again denied the motion.

Knight belatedly appeared, and both he and King cross examined the City's second witness. In the middle of the hearing, King mentioned that he "found out" he had a chemotherapy treatment the next day at 3:30 p.m. The hearing examiner said they could address scheduling at the end of the hearing.

At 3:00 p.m., after the direct testimony and cross examination of its final witness, the City rested its case and the hearing examiner informed King and Knight it was time to present their witnesses. King asked the court to adjourn, stating that he was "medically" unable to proceed and "way over" his recommended pain medication dosage. King and Knight also asserted that a continuance was needed for "another reason"—because Gary Bryant, the first witness they intended to call, was unavailable. Knight and King explained that although the court had issued a subpoena for Bryant's testimony, they had not served it because Bryant agreed to appear voluntarily. They

6

reported that Bryant had been admitted to the hospital that day on an emergent basis. As to the substance of Bryant's testimony, King and Knight indicated that Bryant had performed repairs over the years, recently obtained a contractor's license, and would be able to do some of the repairs needed to correct the violations. When asked if Bryant would testify that he obtained permits for the work he previously did at that home, Knight said, "I don't know."

The hearing examiner explained that he intended to proceed with the hearing for at least another 30 minutes, noted the previous finding that a continuance was not medically necessary, and remarked that King continued to demonstrate sufficient cognitive ability and memory recall to proceed. The hearing examiner also found no good cause to delay the hearing based on witness availability. The hearing officer swore in Knight as a witness, and King proceeded to elicit his testimony.

When the hearing examiner recessed for the day at 4:40 p.m., he reminded the parties that they would begin the next day at 1:30 p.m. to complete Knight's testimony. Again, King said he had a chemotherapy appointment, but this time, said the appointment was at 3:00. The hearing examiner responded that they would "go back on the record at 1:30" and "examine how far we can get."

When the parties appeared the next day, on October 8, King, via Zoom, said he was "in the middle of a medical examination." King asked a person in the room with him, purportedly a medical assistant, to confirm that medical staff would not "allow a hearing during the examination." The person did not confirm this but said the doctor "can wait. I'll just tell her that you're in the middle of a hearing."

The hearing officer reiterated that if King had additional questions for Knight, he

7

should proceed to ask them, and King continued to insist that medical staff would not allow him to do so and that he had informed "everybody" the day before of his unavailability. King confirmed that he did have "a few" additional questions for Knight but could not ask them during a medical examination. And because of his chemotherapy treatment scheduled after the appointment, King said he was unavailable for the rest of the day. The hearing examiner made the following finding:

> [I]t is 1:40. Mr. King had presented to this hearing officer last week the dates and times that he was available. Mr. King noted that he was available in the afternoon on both dates and times. At no time did Mr. King make this hearing officer aware of any sessions that he needed to be at during the same time period. Given that, I don't have a doctor's declaration or the like, noting that today's procedure was scheduled months ago and or that it is a necessary procedure and or that Mr. King was not aware of the procedure [taking] place today. I can only make the finding that Mr. King has made himself voluntarily not available to proceed … His motion to continue has been previously denied … and he has not provided any alternative means or dates and times available … Mr. King has prosecuted a pattern of [seeking] a continuance for any and all reasons possible …I don't have any declarations from a doctor noting the requirement not to be present.

In response, King said his medical providers would send "formal notice" that he "had to be here" for the appointment. He requested that the hearing be "held" over so he could testify "next week." King then left the video hearing, Knight had already left the building, and the hearing examiner concluded the hearing without further testimony or argument.

The hearing examiner later issued findings and conclusions, determined that the evidence supported each of the code violations, and affirmed the NOV.[4] The hearing examiner noted the abrupt conclusion of the hearing on October 8, in the middle of Knight's testimony, after King said he could not continue, and Knight left the hearing room. The hearing examiner noted that King and Knight had submitted a document,

---

[4] The hearing examiner adjusted the deadlines for corrective actions.

presumably after the hearing, but the hearing examiner did not credit the submission because it was "unsigned" and not "compelling evidence supported by any materials."[5] The hearing examiner also noted that he reviewed a motion to "re-open" the proceeding but determined King and Knight had "voluntarily excused themselves from the proceedings" and there was no "good cause" to reopen the matter.[6] The hearing examiner later denied a motion for reconsideration related to the ADU.

Knight and King (Petitioners) filed a LUPA petition in superior court and then a motion to vacate the hearing examiner's decision. The superior court held an initial hearing, denied the motion to vacate, rejecting the Petitioners' jurisdictional arguments. The court allowed the Petitioners to request discovery but based on the City's explanation that the "binder" provided at outset of the administrative hearing no longer existed, the court directed the Petitioners to request specific documents, or categories of documents, and not simply the binder.[7]

Before the hearing on the merits, the LUPA court denied several additional motions filed by the Petitioners, including a motion to reconsider the ruling on the motion to vacate, a motion to supplement the record and for discovery, and a motion requesting recusal. After a hearing, the superior court denied the LUPA petition. The superior court entered findings and conclusions, including a conclusion that the hearing examiner had "jurisdiction and authority to affirm the NOV." The superior court also concluded that "no procedural errors occurred in the multi-day hearing warranting

---

[5] The appellate record does not appear to include this document referenced in the findings and conclusions.

[6] The appellate record does not appear to include the motion to reopen the hearing.

[7] The City confirmed that it had retained all original documents that were included in the binder and would produce any specific document upon request.

reversal." Specifically, as to the motions to continue, the court noted that the hearing examiner granted accommodations, the Petitioners presented no evidence establishing that a continuance was medically necessary, and the hearing examiner had an opportunity to observe King's ability to make arguments, recall facts, and question witnesses. Accordingly, the superior court determined the hearing examiner did not abuse his discretion. The superior court later denied reconsideration.

The Petitioners appeal.[8]

## DISCUSSION

In Washington, LUPA governs "judicial review of land use decisions made by local jurisdictions." RCW 36.70C.010. On appeal, we stand in the same position as the superior court and limit our review to the record that was before the hearing examiner. Pinecrest Homeowners Ass'n v. Cloninger & Assocs., 151 Wn.2d 279, 288, 87 P.3d 1176 (2004). The party seeking relief bears the burden of demonstrating that one of six grounds are met:

> (a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
>
> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
>
> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
>
> (d) The land use decision is a clearly erroneous application of the law to

---

[8] We consider the Petitioners' arguments to the extent they are supported by meaningful legal argument, citations to legal authority, references to relevant portions of the record, and are not raised for the first time in reply. See RAP 10.3(a)(6) (content requirements for appellate briefing); see also Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration").

the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130(1); see also Pinecrest Homeowners Ass'n, 151 Wn.2d at 288.

The standards in subsections (a), (b), (e), and (f) are questions of law we review de novo. Cingular Wireless, LLC v. Thurston County, 131 Wn. App. 756, 768, 129 P.3d 300 (2006). As below, the Petitioners do not challenge the violations assessed by the City, identify any error of law, or address the standards of review under LUPA.[9]

## Motions to Continue

*A. Medical Documentation*

The Petitioners claim the hearing officer "unilaterally disregard[ed]" the medical documentation that supported their requests for a continuance. We disagree.

The MTMC affords broad discretion to hearing examiners as to the schedule and conduct of hearings, including express authority to "[r]egulate the course of the hearing," "[d]ispose of procedural requests or similar matters," and to "take any other action authorized by or necessary to" fulfill their duties under the code. MTMC 2.120.080 (E), (I), (O). Here, the record demonstrates that the hearing examiner considered the

---

[9] In response to the City's argument that the Petitioners failed to establish grounds for relief under LUPA, the Petitioners claim in reply that, notwithstanding the fact that they sought judicial review under LUPA, LUPA does not apply. The Petitioners' argument relies on language in RCW 36.70C.020(2)(c), which provides that LUPA does not apply where "a local jurisdiction is required by law to enforce the ordinances in a court of limited jurisdiction." However, unlike the case in Post v. City of Tacoma, 167 Wn.2d 300, 312, 217 P.3d 1179 (2009), the Petitioners fail to establish that the City's procedural scheme required the City to enforce the underlying code violations in courts of limited jurisdiction. See MTMC 1.15.080 (code violations "may be enforced by issuing notices of violation and, if necessary, by filing civil infractions").

parties' positions and materials and ruled on their scheduling and continuance requests. After granting an initial continuance over the City's objection, the hearing officer addressed King's request for a medical continuance and expressly considered his medical documentation. That documentation, a September 26, 2024 letter signed by a medical doctor, states in full:

> Mr. King is a patient of mine at the Fred Hutch Pain Clinic and is being treated for long term pain control. Mr. King is unable to walk long distances and sit for long periods of time. He fatigues quickly with activity and reports short term memory loss. Increasing his pain medication temporarily, as suggested by the hearing examiner, would be dangerous, and is not an option. Please excuse him from court for at least 60 days.

The hearing examiner's written order clarified that, contrary to the letter, "[a]t no time" did the hearing examiner direct King "take medication" or submit to other medical treatment. And, as noted, the hearing examiner explained that the letter was unpersuasive because it was not a sworn statement, "somewhat conclusory," and it appeared to include findings that were "dictat[ed]" by the patient, rather than "objective." And "most importantly," to the extent the physician's letter opined that cognitive and memory impairment would prevent King from participating in his appeal hearing, that opinion was in "complete conflict" with the hearing examiner's own observations. The hearing examiner found that King demonstrated "clear and convincing" ability to answer questions, submit motions, present clear arguments, and remember historical information about the property and the City's investigation. And again, before the evidentiary hearing began, the hearing examiner granted accommodations to address King's medical condition, allowing him to appear by Zoom, request breaks at any time, and to request recess or a break if any hearing exceeded two hours.

Although the hearing examiner did not specifically address the second letter,

dated October 1, the Petitioners cannot establish abuse of discretion or prejudice. The reasons the hearing examiner found the first letter unconvincing apply equally to the second. Apart from conclusory statements that King's mental capacity was "affected" and his testimony could be "unreliable," the letter provides the same information as the September 26 letter, almost verbatim. Like the first letter, the October 1 letter was not a sworn statement, and it was signed by the "Pain Clinic Nurse Coordinator," not King's physician. Most critically, as the hearing examiner reiterated throughout the case, the assertion that cognitive issues would preclude King's participation did not align with the hearing examiner's observations.

In sum, the record does not show that the hearing examiner failed to consider King's documentation, abused his discretion under the MTMC, employed an "unlawful procedure" or "failed to follow any prescribed process." [10] See RCW 36.70C.130(1)(a).

## B. Scheduling Conflict

The Petitioners also challenge the hearing examiner's denial of the request to continue the October 8, 2024, hearing, due to a scheduling conflict with King's medical treatment.

Relying on caselaw in criminal proceedings, the Petitioners assert that scheduling conflicts may be "valid grounds" to grant a continuance. See, e.g., State v. Jones, 117 Wn. App. 721, 729, 72 P.3d 1110 (2003) (discussing relevant considerations

---

[10] The Petitioners also suggest that the hearing examiner's ruling on his request for a medical continuance violated GR 33. GR 33 allows for persons with disabilities to make requests for "measures to make each court service, program, or activity, when viewed in its entirety, readily accessible to and usable by a person with a disability." GR 33(a)(1). The hearing examiner granted accommodations to King. The record does not indicate that King asserted a disability below or requested different accommodations to make the proceeding accessible. And as explained, the hearing examiner did not disregard or abuse its discretion as to King's medical documentation and request for a 60-day continuance.

in determining whether witness unavailability warrants continuance). But they provide no authority supporting the position that a continuance is <u>required</u> whenever a party raises a potential scheduling conflict, especially when a party raises the conflict belatedly and an actual conflict is uncertain. Here, King reported the conflict the day before the scheduled hearing and identified a potential conflict at 3:00 or 3:30.[11] The October 8 hearing was scheduled for 1:30. It was not clear how long the hearing would last, since Knight had already testified for approximately an hour and a half, no party provided an estimate of how much additional testimony he would provide, and neither Knight nor King indicated that any other witness would testify on October 8.[12] And significantly, the hearing examiner did not definitively refuse to continue the hearing if a conflict arose with King's chemotherapy treatment; he simply directed that they would "go back on the record at 1:30" as scheduled to see "how far we can get."

In view of the information before the hearing examiner and the hearing examiner's discretion under MTMC 2.120.080 to manage the proceeding, and address scheduling requests and conflicts, the Petitioners fail to establish an abuse of discretion. And again, they establish no basis for relief under LUPA because they do not identify an unlawful procedure or prescribed process the hearing examiner failed to follow. <u>See</u> RCW 36.70C.130(1)(a).

---

[11] The evidence of e-mail messages sent to the clerk on the morning of October 8 and submitted to superior court in the LUPA matter do not specifically mention a 1:30 appointment, or the timing of any earlier appointment.

[12] On October 7, both King and Knight stated they intended to present the live testimony of one witness but reported that the witness was in the hospital and unavailable for an unknown duration. King mentioned a second individual but did not indicate that he had done anything to secure his testimony or provide any information about his availability.

Termination of the Hearing

The Petitioners contend the hearing examiner acted with "unnecessary cruelty" by insisting on proceeding with the hearing on October 8 and "unjustly" concluded the proceeding.

The Petitioners claim the hearing examiner (1) refused to engage in meaningful discussion; (2) refused to consider rescheduling even though King offered dates "two business days away;" (3) required King to proceed with the hearing although medical staff would not allow it; (4) forced King to choose between a "potentially life-saving" treatment and presenting his case; (5) terminated the hearing in "retaliation;" (6) excluded five witnesses the Petitioners intended to present in support of their case.

The record does not support these factual premises. First, although the Petitioners allege a "direct conflict" with King's chemotherapy treatment, the record is clear that the conflict was a medical appointment scheduled at the same time as the hearing. The record does not reveal when the appointment that created the conflict was scheduled or how it related to chemotherapy treatment apparently scheduled later the same day. The only information in the record about the nature of the appointment suggests that the purpose was to address stomach issues and foot pain. Although King said he would submit documentation to substantiate the medical necessity, no document in the record establishes that the appointment was "necessary," or even related to King's cancer treatment.

Nothing beyond King's own statements suggests medical staff would not allow King to participate in the hearing. To the contrary, the transcript indicates that the individual in the examination room stated that the physician would "wait." It does not

15

appear that the circumstances prevented King from asking any questions, or from at least making an offer of proof about the specific remaining areas he intended to address with Knight's testimony or with other witness testimony.

King does not point to any evidence of retaliation. And although he vaguely mentioned his availability "next week," King did not propose any specific dates or times to reschedule the hearing. The claim that the hearing examiner excluded multiple witnesses who were scheduled to testify is inconsistent with the Petitioners' statements on the record the day before. The Petitioners did not identify any witness who was available and prepared to testify on October 8.

The hearing examiner set forth concrete reasons on the record for finding that both King and Knight made themselves "voluntarily not available to proceed." Nothing in the record suggests animus or bias, or any other impropriety. Under the circumstances, the Petitioners fail to establish an abuse of discretion, unlawful procedure, or failure to follow a prescribed process.

<u>City's Binder</u>

The Petitioners raise several issues related to the binder of documents the City compiled for the hearing. They concede that the hearing examiner did not authorize discovery in this matter and there was "no discovery process." The hearing examiner denied the Petitioners' motion for discovery as moot, since the City provided a copy of its binder to them as a courtesy.

Nevertheless, the Petitioners claim the City was required to serve both King and Knight with a copy of the binder and to deliver the binder more than a week in advance of the hearing. MTMC 2.120.080(D) and (H) expressly grant authority to the hearing

examiner to issue subpoenas and authorize discovery. The Petitioners made no showing that discovery was needed. They point to no authority that required the City to formally serve them with copies of the binder, prepare multiple copies, or deliver the copies in a particular timeframe.[13]

The Petitioners also characterize the binder as an official record that the City was required to maintain in its original form. They maintain that the City unlawfully destroyed "evidence" by altering and dismantling the binder during the proceeding. And the Petitioners assert procedural error because the entire binder, and other "motions, emails, and medical records" were not included in the certified record.

But again, nothing supports the Petitioners' assertion that documents included in the binder and not admitted as exhibits were "evidence." The Petitioners do not dispute that the exhibits admitted during the hearing are properly included in the certified record. The hearing officer clarified during the hearing that no party would be prevented from attempting to admit any evidence during its case in chief. The Petitioners did not seek to admit any documentary evidence in their case in chief. Their reference to unspecified motions and e-mails is insufficient to establish that any documents that were properly filed and/or admitted were omitted from the certified record. The Petitioners fail to establish procedural error under RCW 36.70C.130(1)(a).

Jurisdiction

Because the City's code generally declares that violations of its ordinances constitute "nuisances," and Article IV, Section 6 of the Washington Constitution

---

[13] The Petitioners repeatedly describe the compilation they received as a 500-page binder, but they described it to the hearing examiner (who also had a copy) as a "300 page binder" and City estimated it had fewer than 100 pages.

17

expressly grants the superior courts "original jurisdiction" over "actions to prevent or abate a nuisance," the Petitioners assert that the hearing examiner had no jurisdiction to adjudicate this code enforcement matter. See MTMC 5.05.060(B) (conducting business without a business license is a "public nuisance"); MTMC 8.15.015 (declaring violations of city ordinances to be detrimental to health and safety and "nuisances"); MTMC 8.15.030(G) (defining nuisance as, among other things, any violation of city code). We disagree.

No authority supports the position that the City's characterization or description of code violations as nuisances dictates the nature of the action. The City commenced a code enforcement action by filing a NOV "pursuant to Chapter 1.15" of the MTMC. See MTMC 1.15.080 (addressing enforcement of municipal code violations). The code enforcement provisions of the MTMC require appeals to be adjudicated by a City hearing examiner. MTMC 1.15.140; 1.15.150. Because the City was enforcing its ordinances, and did not bring a common law nuisance claim against the Petitioners, original jurisdiction under Article IV, section 6 is not implicated. The Petitioners fail to establish an unlawful procedure or that the underlying land use decision amounts to a constitutional violation.[14] See RCW 36.70C.130(1)(a), (f).

### Conflict of Interest

Finally, the Petitioners claim the City's hearing examiner is an "at will employee who can be terminated at any time" by the City Council. They further assert that the at-will termination clause potentially caused the hearing examiner to favor the City. As a

---

[14] Relatedly, although the Petitioners argue that, as a matter of policy, the superior court is a preferable forum, they provide no authority that calls into question the City's authority to enact regulations enforcing its ordinances and designate its hearing examiners to adjudicate code enforcement appeals.

result, the Petitioners maintain that the hearing examiner's employment contract and decision are void.

The Petitioners' argument relies on the appearance of fairness doctrine. "[I]n the context of administrative proceedings, the appearance of fairness doctrine exists in tension with the presumption that public officials will properly perform their duties." Nationscapital Mortg. Corp. v. Dep't of Fin. Insts., 133 Wn. App. 723, 759, 137 P.3d 78 (2006). To overcome this presumption, the party invoking the appearance of fairness doctrine must present evidence of actual or potential bias. Magula v. Dep't of Lab. & Indus., 116 Wn. App. 966, 972, 69 P.3d 354 (2003). If a party presents sufficient evidence of bias, we determine whether the proceeding would appear to be unfair to a reasonably prudent and disinterested person. Chi., Milwaukee, St. Paul & Pac. R.R. v. Human Rights Comm'n, 87 Wn.2d 802, 810, 557 P.2d 307 (1976).

The Petitioners identify no authority that supports the claim that the hearing examiner's employment contract is void. And they offer no evidence, beyond speculation, of actual or potential bias. City of Lake Forest Park v. Shorelines Hearings Bd., 76 Wn. App. 212, 217, 884 P.2d 614 (1994) (violation of the appearance of fairness doctrine requires specific evidence of bias, not mere speculation). The Petitioners demonstrate no relationship, for instance, between the percentage of hearings adjudicated in the City's favor and the amount of compensation or continued employment. The Petitioners' speculative claims of potential bias are insufficient and do not invalidate the hearing examiner's decision.

## CONCLUSION

We affirm.

_Coburn, J._

WE CONCUR:

_Feldman, J._      _Díaz, J._